EDWIN V. GOSS, INC., demandante y peticionario, *v.* DYCREX CONSTRUCTION & COMPANY, S.E., demandada y recurrida; PUERTO RICO DREDGING & MARINA CONSTRACTORS, INC., demandante y coparte, *v.* DYCREX CONSTRUCTION & COMPANY, S.E., demandada y coparte.

*Número:* CE-95-89      *Resuelto:* 9 de julio de 1996

344

EL JUEZ ASOCIADO FUSTER BERLINGERI emitió la opinión del Tribunal.

Nos toca resolver si la acción derivada del Art. 1489 del Código Civil, 31 L.P.R.A. sec. 4130, a favor de los materialistas y obreros de una obra ajustada por el contratista, y en contra de su dueño, puede surgir a partir del momento en que el suplidor o el obrero haga una reclamación *extrajudicial* al dueño.

I

Allá para marzo de 1992, Dycrex Construction & Company, S.E. (en adelante Dycrex) se desempeñaba como contratista general del proyecto conocido como Puente Teodoro Moscoso, en la laguna San José de Carolina. A fin de llevar a cabo la construcción del puente, Dycrex solicitó unas cotizaciones de varias compañías para el dragado de aproximadamente 24,000 metros cúbicos de fango y arena ubicados en dicha laguna. Entre las compañías que cotizaron, se encontraban Andrew Marine Services, Inc. (en adelante Andrew Marine) y Puerto Rico Dredging & Marina Contractors, Inc. (en adelante P.R. Dredging). Al evaluar las propuestas de cada una de éstas, el 1ro de mayo de 1992, Dycrex seleccionó y otorgó un contrato con Andrew Marine, no sin antes advertirle que el dragado debía realizarse con suma rapidez, ya que para mediados de julio llegarían al lugar las barcazas contratadas para hincar los pilotes. Transcurrido alrededor de mes y medio desde que Andrew Marine comenzara a dragar, Dycrex, con la seguridad de que el trabajo que habría de efectuarse por ésta no se completaría dentro del término estipulado, se comunicó con P.R. Dredging para solicitarle de nuevo una cotización; esta vez le requirió que la draga que se utilizara fuese de mayor diámetro que la exigida en la propuesta anterior.

El 15 de junio de 1992, P.R. Dredging remitió a Dycrex su cotización. Ésta establecía que para la extracción de los 24,000 metros cúbicos de fango y arena utilizaría una draga marca *Ellicot* de 14 pulgadas de diámetro, e instala-

ría alrededor de 6,500 pies de tubería de polietileno de 14 pulgadas de diámetro. La labor incluía montar y desmontar todos los artefactos necesarios. Por último, cotizó el trabajo de movilización del equipo que se utilizaría en el dragado en $100,000, y el de extracción en $10 por metro cúbico.

El 19 de junio de 1992, Dycrex remitió una carta a P.R. Dredging. Le informaba de su intención de otorgarle el contrato de dragado. Indicó, además, que a fin de poder efectuar el documento de subcontrato, debía comenzar a realizar los trámites de seguro y la fianza correspondiente.

Con el propósito de comenzar los trámites requeridos por Dycrex, el 25 de junio de 1992 P.R. Dredging solicitó una cotización de Edwin V. Goss, Inc. (en adelante Goss) para la transportación de la draga que sería utilizada en la laguna. La cotización suministrada por Goss, por el precio de $25,850, incluía: levantar la draga de la Bahía de Pozuelos en Guayama; sujetarla a una plataforma; transportarla hasta la laguna San José, y bajarla de la plataforma. La cotización no incluía armar la draga, que estaba en piezas. Según la cotización y el acuerdo al que llegaron ambas partes, P.R. Dredging pagaría la mitad de ésta al comenzar el trabajo, y el balance al finalizarlo.

El 27 de junio de 1992, P.R. Dredging emitió un cheque por $12,900 a favor de Goss. Recibido dicho cheque, Goss procedió a levantar y transportar la draga de la Bahía de Pozuelos a la laguna San José. Al bajar la draga en la laguna San José, P.R. Dredging le solicitó que armara la draga y la pusiera en el agua, trabajo que Goss completó el 8 de julio de 1992. Por dicho servicio, el 9 de julio de 1992 Goss facturó la suma adicional de $25,709.50. Concluida su labor en la laguna sin que P.R. Dredging le pagase los $12,950 restantes de la factura original ni los $25,709.50 de la factura adicional, el 29 de julio de 1992 Goss remitió directamente a Dycrex una carta en la que le notificaba la cantidad adeudada por P.R. Dredging y le solicitaba su

ayuda para poder cobrarla. Dycrex contestó que desde el 16 de julio de 1992, le había remitido a P.R. Dredging la cantidad de $100,000 en concepto de movilización de la draga, razón por la cual, en esos momentos, no adeudaba nada a dicha compañía. No empece lo anterior, con posterioridad a esta reclamación extrajudicial de Goss, el 31 de julio de 1992 y el 12 de agosto de 1992 Dycrex realizó unos pagos en favor de P.R. Dredging por las cantidades de $14,970 y $50,000, respectivamente.

El 14 de agosto de 1992, Goss presentó una demanda en cobro de dinero contra P.R. Dredging, al igual que contra Dycrex, esta última en su capacidad de contratista general de la obra, para reclamar la cantidad adeudada.

Con posterioridad a la presentación de esta demanda, Dycrex y P.R. Dredging trabaron una pugna con respecto al cumplimiento de cada uno de ellos con los términos del contrato de dragado. Las desavenencias surgidas entre ambas partes trajeron consigo el abandono del proyecto por P.R. Dredging, la resolución del contrato por Dycrex, y la presentación por P.R. Dredging, dentro del mismo pleito instado por Goss, el 15 de enero de 1993, de una demanda de coparte contra Dycrex.

El 23 de marzo de 1994, el Tribunal de Distrito, Sala de Carolina, dictó sentencia. Declaró con lugar la demanda de coparte en favor de P.R. Dredging. De acuerdo con las determinaciones de hecho realizadas por dicho foro, Dycrex y P.R. Dredging habían acordado el dragado de 24,000 metros cúbicos de material, y no la cantidad menor que, luego del trabajo de Andrew Marine, al momento de la segunda cotización, había en la laguna. Por ello, el tribunal concluyó que Dycrex había engañado a P.R. Dredging respecto de la cantidad de metros cúbicos por dragar, a los únicos fines de obtener una mejor cotización por el trabajo que habría de realizarse.

Por otro lado, dispuso que tanto P.R. Dredging como Dycrex eran solidariamente responsables ante Goss, por la

cantidad total de $38,659.50 adeudada a éste. A estos efectos, resolvió que el contrato inicial otorgado entre Goss y P.R. Dredging sólo incluía sacar la draga del agua en la Bahía de Jobos, transportarla por la carretera a la laguna San José y bajarla del transporte. Ésta se encontraba en piezas. Procedía entonces que, además de imponer el pago del balance adeudado en el contrato original, o sea, los $12,950, se pagara $25,709.50 por aquellas diligencias adicionales ejecutadas por Goss, entre éstas, levantar las piezas de la draga, armarla y tirarla al agua. También resolvió el foro a quo que la cantidad que pagase Dycrex a Goss en concepto de esta sentencia, sería adicional a la que debía pagar en favor de P.R. Dredging.

Así las cosas, el 22 de abril de 1994 Dycrex presentó un escrito de apelación ante el Tribunal Superior, Sala de Carolina. Adujo, en síntesis, que el foro sentenciador había errado al determinar que el incumplimiento de P.R. Dredging se debió a la anuencia o culpa de Dycrex. Asimismo, alegó que, como para ser ella responsable el balance adeudado a Goss debía estar comprendido dentro de la cantidad supuestamente no pagada a P.R. Dredging, el tribunal inferior erró al concluir que la cantidad que ha de pagarle a Goss era adicional a la que, por la misma labor, tuviese que pagarle a P.R. Dredging.

El 28 de diciembre de 1994, el Tribunal Superior dictó una sentencia mediante la cual revocó parcialmente la emitida por el Tribunal de Distrito. Resolvió que Dycrex nunca indujo a P.R. Dredging a creer que dragaría 24,000 metros cúbicos. Determinó, además, que P.R. Dredging incumplió con los términos del contrato al no completar el dragado dentro del período acordado y al depositar el fango, la arena y la arcilla fuera del lugar señalado. Como consecuencia, declaró sin lugar la demanda de coparte instada por P.R. Dredging; acogió como reconvención la prueba de daños presentada por Dycrex; declaró ésta con lugar, y devolvió el caso al Tribunal de Distrito para que,

en una vista celebrada a dichos fines, recibiera prueba sobre los daños líquidos sufridos por Dycrex.

Respecto a la demanda incoada por Goss, el tribunal mantuvo en todo su vigor la sentencia dictada contra P.R. Dredging, pero declaró sin lugar la reclamación en contra de Dycrex. El Tribunal Superior resolvió que, según el Art. 1489 del Código Civil, *supra*, la responsabilidad de Dycrex estaba supeditada a la deuda que existiese entre Dycrex y P.R. Dredging, al momento de la *reclamación judicial*, sin que importase la que hubiera al momento cuando se realizó la reclamación extrajudicial. Habida cuenta de que al momento de la reclamación judicial, la liquidación del contrato reflejaba un balance en favor de Dycrex, procedía desestimar la acción de Goss contra ésta. Se archivó en autos copia de la notificación de esta sentencia el 12 de enero de 1995.

Inconforme con dicha decisión, el 6 de febrero de 1995, Goss acudió ante nos mediante solicitud de *certiorari*. En lo pertinente, alegó la comisión del error siguiente:

1. Erró el Honorable Tribunal Superior al determinar como cuestión de derecho que la notificación extrajudicial de Goss a Dycrex, el 29 de julio de 1992, sobre la deuda de su subcontratista no tiene valor legal alguno y, por tal razón, no le convierte en acreedor de Dycrex.

Luego de expedir el recurso ante nuestra consideración, requerimos la presentación de los alegatos correspondientes.

El 30 de octubre de 1995, Goss presentó su alegato ante nos. Adujo, en síntesis, que la falta de claridad del Art. 1489 del Código Civil, *supra*, respecto a lo que constituye una reclamación, debe interpretarse, de acuerdo con el espíritu de dicho precepto, como si incluyese tanto la reclamación judicial como la extrajudicial.

El 21 de noviembre de 1995, Dycrex, en su alegato ante nos, adujo, en esencia, que la protección del citado Art. 1489 no puede ser concedida en favor del obrero o materia-

lista con la mera notificación al dueño de la obra, sin tomar en consideración los derechos que este último posea bajo el contrato con el contratista y sin haberse precisado judicialmente cuánto, si algo, el dueño debe al contratista, y desde cuándo es ello así. Dycrex alegó que este Tribunal reiteradamente ha reconocido que la acción directa del obrero y materialista surge al momento de la reclamación judicial, no luego de una mera notificación, y citó, en apoyo de su contención, nuestras decisiones en *R. Román & Cía. v. J. Negrón Crespo, Inc.*, 109 D.P.R. 26 (1979); *Amer. Surety Co. v. Tribunal Superior*, 97 D.P.R. 452 (1969), y en *Armstrong, Etc. v. Inter-Amer. Builders, Inc.*, 98 D.P.R. 734 (1970).

Con el beneficio de las comparecencias de ambas partes, pasamos a resolver.

## II

El Art. 1489 del Código Civil, *supra*, aquí en controversia, dispone que:

Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tienen acción contra el dueño de ella sino hasta la cantidad que éste adeude a aquél *cuando se hace la reclamación*. (Énfasis suplido.)

Como reconociéramos en *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, la protección a los proveedores de trabajo que brinda el precepto antes mencionado fue recogida por el movimiento codificador español de su contraparte francés, el Art. 1798. Véanse, además: Q.M. Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1960, T. XXIV, Vol. II, pág. 158; F. Puig Peña, *Tratado de Derecho Civil Español*, 2da ed., Madrid, Ed. Rev. Der. Privado, 1973, T. IV, Vol. II, pág. 359; R. De Ángel Yagüez, *Los créditos derivados del contrato de obra: su protección legal en la legislación civil*, Madrid, Ed. Tecnos, 1969, págs. 11–12; F. Laurent, *Principios de Derecho Civil Francés*, Puebla, Ed. Barroso, 1900, T. XXVI, pág. 95.

■ Como se sabe, el artículo en cuestión establece una clara excepción al principio general del derecho de obligaciones de que sólo entre otorgantes y causahabientes tienen efecto los contratos. Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374; *C. Armstrong e Hijos v. Díaz*, 95 D.P.R. 819, 823 (1968); *Amer. Surety Co. v. Tribunal Superior*, supra, págs. 454–455; *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 30; C. Valverde y Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Ed. Talleres Cuesta, 1937, T. III, Vol. I, pág. 600. Como excepción a la regla general, nuestro Art. 1489, *supra*, le brinda a los obreros y materialistas la oportunidad de incoar una reclamación contra el dueño de la obra, aun cuando aquellos no estuviesen vinculados con éste por una relación contractual previa. *Amer. Surety Co. v. Tribunal Superior*, supra; J. Santamaría, *Comentarios al Código Civil*, Madrid, Ed. Rev. Der. Privado, 1958, T. II, pág. 641; V. Prieto Cobos, *Ejercicio de las Acciones Civiles*, 5ta ed., Madrid, Ed. Lex, 1984, T. III, Vol. I, pág. 683.

■ La reclamación aludida ha sido catalogada por este Tribunal como una verdadera acción directa en favor del materialista u obrero, que no está sujeta a las limitaciones de la acción subrogatoria que por *mos* del Art. 1064 del Código Civil, 31 L.P.R.A. sec. 3828,(¹) le cobijaría como acreedor. *C. Armstrong e Hijos v. Díaz*, supra, pág. 824; *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 455; *Empresas Capote, Inc. v. Tribunal Superior*, 103 D.P.R. 765, 770 (1975); *The Comm. Ins. Co. v. Cía. de Fomento Ind.*, 123 D.P.R. 150, 159 (1989); F.C. De Diego y Gutiérrez, *Instituciones de Derecho Civil Español*, Madrid, Ed. Victoriano Suárez, 1959, T. II, págs. 326–327; J. Santos Briz, *El*

---

(¹) El Art. 1064 del Código Civil, 31 L.P.R.A. sec. 3028, establece que:

"Los acreedores, después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo fin, exceptuando los que sean inherentes a su persona; pueden también impugnar los actos que el deudor haya realizado en fraude de su derecho."

*contrato de ejecución de obra y su problemática jurídica*, 56 Rev. Der. Priv. 379, 407 (1972); M. Albaladejo, *Derecho Civil*, 8va ed., Barcelona, Ed. Bosch, 1989, T. II, Vol. 2, pág. 316; J. Castán Tobeñas, *Derecho Civil Español, común y foral*, 12ma ed., Madrid, Ed. Reus, 1985, T. 4, pág. 517. Según el citado Art. 1489, y contrario a lo que se requiere bajo la acción subrogatoria, los obreros o suplidores que ayuden en la ejecución de una obra quedan liberados de realizar una excusión previa en los bienes del deudor principal. *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 30; Scaevola, *op. cit.*, pág. 161; J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1982, T. II, Vol. II, pág. 474. De igual forma, frente a estos obreros o materialistas, no es oponible cualquier reclamación que, a modo de compensación o de otra manera, pudiese presentar el dueño de la obra contra el contratista, por razón de trabajos distintos no relacionados con el contrato para la realización de la obra que dio margen a la acreencia. *C. Armstrong e Hijos v. Díaz*, supra, pág. 827; *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 31; Scaevola, *op. cit.*, pág. 164.

■ Desde el momento mismo de la reclamación, el dueño de la obra se convierte en deudor de los materialistas y obreros, y deja de serlo del contratista, hasta el punto de que los acreedores particulares de éste no podrán concurrir con los obreros y materialistas en la suma debida por el dueño. *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 456; *Empresas Capote, Inc. v. Tribunal Superior*, supra, pág. 770. Así por ejemplo, en virtud de dicho artículo, los obreros y materialistas quedarían protegidos en caso de insolvencia o quiebra del contratista si, con anterioridad a dicho evento, hubiesen reclamado del dueño de la obra la cantidad que se les adeude. *Amer. Surety Co. v. Tribunal Superior*, supra, págs. 456–457; J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. X, Vol. 2, pág. 735.

Por razón de lo antes expuesto, definimos la naturaleza de esta acción como una "verdadera medida de ejecución y medio de pago ...[que otorga] un derecho de preferencia a los [obreros y materialistas], y [permite] la inoponibilidad de excepciones que no surjan del propio acercamiento jurídico de donde surgió inicialmente el crédito que se ejercita". *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 31. Véanse: *The Comm. Ins. Co. v. Cía. de Fomento Ind.*, supra, pág. 159; Santos Briz, *op. cit.*, pág. 408 esc. 61.

■ El alcance de los privilegios anteriormente reconocidos ha sido limitado por este Tribunal a los únicos efectos de establecer que la acción creada por este artículo en favor de los obreros y materialistas no supone la modificación de la situación sustantiva que rige las relaciones entre el dueño de la obra y el contratista. *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 31.

En razón de ello, hemos resuelto que el derecho que posee el obrero y materialista contra del dueño de la obra para cobrar lo que el contratista le adeuda, en concepto de materiales suplidos y usados en la obra, está limitado en dos extremos:

a. a la cantidad que le adeude el dueño de la obra al contratista bajo el contrato de tal construcción, cuando se hace la reclamación mediante la interposición de la acción.

b. el suplidor no adquiere ante el dueño de la obra más derechos que los que tenía el contratista, de manera que la cantidad adeudada está sujeta necesariamente a liquidación por razón de reajustes o posibles reclamaciones recíprocas que surjan en relación con la obra contratada entre el contratista empresario y el dueño de la misma. Sin embargo, tales reajustes no incluyen la variación del precio del contrato de construcción por convenio privado entre el contratista y el dueño de la obra en perjuicio de los que suministran materiales. (Énfasis suprimido.) *Armstrong, Etc. v. Inter-Amer. Builders, Inc.*, supra, pág. 741. Véase *El Toro Electric Corp. v. Zayas*, 106 D.P.R. 98, 101–102 (1977).

■ Asimismo, hemos establecido que los efectos privilegiados de esta acción pueden ser perjudicados en aque-

llos casos en que el contratista cede a un tercero el crédito que tiene contra el dueño de la obra antes de que los obreros y materialistas hayan incoado una reclamación contra este último. *Armstrong, Etc. v. Inter-Amer. Builders, Inc.*, supra, pág. 742; Scaevola, *op. cit.*, pág. 170. En estos casos, hemos reconocido que "la acreencia de [los obreros y materialistas] no tendrá prelación o preferencia sobre la del cesionario". *The Comm. Ins. Co. v. Cía. de Fomento Ind.*, supra, pág. 159.

No obstante la normativa antes reseñada, contrario a lo alegado por Dycrex, la controversia en el caso de autos, respecto del tipo de reclamación judicial o extrajudicial que crea una acción directa bajo el Art. 1489, *supra*, contra el dueño de la obra, no ha sido resuelta por este Tribunal.

Los casos citados por Dycrex, en los que alegadamente este Tribunal resolvió dicha controversia, no planteaban realmente el problema en cuestión. Así, por ejemplo, en *R. Román & Cía v. J. Negrón Crespo, Inc.*, supra, las controversias suscitadas ante nos se circunscribieron a dos planteamientos: (1) si los fondos que retuviera el dueño de una obra para garantizar el fiel cumplimiento del contrato quedaban a expensas de una reclamación presentada a virtud del Art. 1489, *supra*, por los obreros y materialistas independientemente de las resultas de la obra, y (2) si, luego de presentada una demanda contra el dueño, éste podía realizar un pago en favor de la fiadora que se hizo cargo de la obra.

Contestamos tales interrogantes en la negativa, al decidir que el suplidor u obrero no adquiere frente al dueño de la obra mayores derechos que los que tenía el contratista y que dicho dueño podía oponer frente a éstos cualquier daño que sufriera por el incumplimiento del contratista con los términos del contrato de obra. Respecto de la segunda controversia, dispusimos que "*la presentación de la demanda y su subsiguiente notificación al principal, tiene el efecto de convertir al materialista accionante en acreedor directo*

del principal con prelación al propio contratista". (Énfasis suplido.) *R. Román & Cía. v. J. Negrón Crespo, Inc.*, supra, pág. 36. También dispusimos que "desde que el dueño *es demandado* por los obreros se convierte en deudor de éstos". (Énfasis suplido.) Íd., pág. 35. Las expresiones antes mencionadas las hicimos con el solo propósito de sancionar el pago realizado por el dueño con posterioridad a la demanda, en favor del fiador-contratista, y no para establecer el hecho de que la presentación de la demanda era el *único* medio que activaba las disposiciones del citado Art. 1489. Adviértase, además, que la controversia en tal caso no requería que estableciéramos si una reclamación extrajudicial convertía al dueño en deudor directo de los obreros, pues contrario al caso de autos, los pagos que realizara allí el dueño de la obra en favor del contratista los hizo luego de la presentación de la demanda por el subcontratista.

Asimismo, en *Amer. Surety Co. v. Tribunal Superior*, supra, no procedía resolver dicha interrogante, ya que la controversia ante nosotros se limitaba a cuestionar si el Tribunal de Primera Instancia había errado al concluir que un crédito por contribuciones sobre ingresos en favor del Estado Libre Asociado de Puerto Rico, cuya orden de retención en aseguramiento de sentencia se había dictado el 8 de julio de 1965, gozaba de preferencia sobre una reclamación al amparo del Art. 1489 del Código Civil, *supra*, incoada mediante una demanda judicial el 26 de abril de 1962, pero adjudicada el 10 de octubre de 1966.

En razón de ello, y habida cuenta que en dicho caso el gravamen por contribuciones al que se intentaba darle preferencia se anotó con posterioridad a la presentación de la demanda, concluimos que "la peticionaria se convirtió en acreedora directa de los dueños de obras desde el instante mismo en que se incoó su *reclamación judicial*". (Énfasis suplido.) *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 457.

Por último, en *Armstrong, Etc. v. Inter-Amer. Builders, Inc.*, supra, nos vimos precisados a resolver si procedía la reclamación de una suplidora contra la dueña de una obra, aun cuando el contratista de ésta había cedido su crédito a un tercero con posterioridad a la presentación de la demanda. Al contestar dicha interrogante en la afirmativa, expusimos que, desde *"la radicación de la acción"*, el dueño de la obra se convirtió en deudor de los materialistas, por lo cual al suplidor no le perjudicaban las cesiones realizadas después de la presentación de la demanda. Véase *Armstrong, Etc. v. Inter-Amer. Builders, Inc.*, supra, pág. 742. Nótese que, contrario a lo alegado por Dycrex, en ese caso no abordamos la interrogante que se encuentra hoy ante nuestra consideración, pues la cesión del crédito por parte del contratista se realizó luego de haber sido interpuesta la demanda por la suplidora.

En resumen, pues, en todos los casos antes mencionados las cuestiones ante nos no incluían la que nos ocupa aquí ahora, y la referencia en ellos a demandas o reclamaciones judiciales se hicieron sólo porque en dichos casos existían tales demandas o reclamaciones. No se hicieron para resolver la cuestión que tenemos ante nos por primera vez en el caso de autos.

III

■ Es evidente que la letra del Art. 1489 del Código Civil, *supra*, no define ni especifica cuál es el tipo de reclamación que los obreros o materialistas tienen que realizar para obtener los beneficios de dicho precepto. Lo indeterminado en este artículo, en torno a lo que constituye una reclamación, nos lleva a considerar la intención, la causa o los motivos que indujeron al Poder Legislativo a adoptar el referido Art. 1489 de nuestro Código Civil, directamente del Código Civil español. Adviértase que ante la letra de una ley ambigua o incierta tenemos la obligación de incli-

narnos "hacia aquella solución que mejor capte el impacto del estatuto en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma enfilada a propiciar el interés público". *Díaz Marín v. Mun. de San Juan*, 117 D.P.R. 334, 344–345 (1986). Véanse: *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669 (1987); *Ind. Cortinera Inc. v. P.R. Telephone Co.*, 132 D.P.R. 654 (1993); *Col. Int'l Sek P.R., Inc. v. Escribá*, 135 D.P.R. 647 (1994); Art. 19 del Código Civil, 31 L.P.R.A. sec. 19.

■ El derecho de acción que otorga el Art. 1489 del Código Civil, *supra*, en favor de obreros y materialistas ha sido concebido por este Tribunal, al igual que por algunos autores, como un legado en respuesta a consideraciones de orden público, moral y de equidad. Véanse: *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 455; *Empresas Capote, Inc. v. Tribunal Superior*, supra, pág. 770; *The Comm. Ins. Co. v. Cía. de Fomento Ind.*, supra, pág. 159. A tales fines, la doctrina es cónsona al admitir que la acción consagrada por la disposición en cuestión surge a raíz de considerarse ilícito " 'que [el] dueño o [contratista] o ambos, hasta por fraudulenta confabulación, se enriquezcan dañadamente con el esfuerzo o la aportación impagada de [los obreros] y materialistas' ". *C. Armstrong e Hijos v. Díaz*, supra, págs. 824–825. Véanse: *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 455; Scaevola, *op. cit.*, pág. 159; Puig Peña, *op. cit.*, pág. 359; Castán Tobeñas, *op. cit.*, pág. 517; D. Espín Cánovas, *Manual de Derecho Civil Español*, 7ma ed., Madrid, Ed. Rev. Der. Privado, 1983, Vol. III, pág. 644. La reclamación en cuestión ha sido catalogada como una "auténtica, verdadera y ejemplar acción de enriquecimiento injusto, intrínsecamente directa; es un caso claro de vigencia de la *actio in rem verso*: a través del patrimonio del contratista se enriquece el comitente, mientras se empobrecen correlativamente los operarios o suministradores, no ligados entre sí por causa jurídica alguna". I. Nart,

*Contrato de Obra y Empresa*, 35 Rev. Der. Priv. 814, 825 (1951); Castán Tobeñas, *op. cit.*, pág. 517.

Según señaláramos en *Amer. Surety Co. v. Tribunal Superior*, supra, por medio de esta acción se intenta propiciar el pronto pago en favor de aquellos obreros y materialistas que ayudaron en la ejecución de una obra ajena.

Por otro lado, advierte Scaevola que existe una paridad entre los obreros y materialistas protegidos por esta acción y los edificantes de buena fe en los casos de accesión. Scaevola, *op. cit.*, pág. 159; *Amer. Surety Co. v. Tribunal Superior*, supra, pág. 456. En ambos supuestos existe un tercero de buena fe con derecho a los materiales, otro que incorpora los materiales y un dueño en cuyo provecho ha de ceder la edificación. Procede, por lo tanto, que los mismos principios que permiten al edificante de buena fe recobrar del dueño el valor de lo incorporado, sean aplicados a los materialistas y obreros que con su labor le sirvieron de beneficio al dueño de la obra. Después de todo, como apuntara Scaevola en su obra, "[n]unca *el trabajo y la laboriosidad ajenos deben ser objeto de dispendio [de otros]*". (Énfasis suplido.) Scaevola, *op. cit.*, pág. 160. Resulta justo, pues, que aquellos en cuya gracia de trabajo y materiales se produjo la obra obtengan un derecho exclusivo sobre su crédito. Laurent, *op. cit.*, pág. 96.

Ni en la letra del referido Art. 1489 ni en su historial encontramos requisito alguno que induzca a pensar que la reclamación allí exigida equivalga únicamente a una demanda judicial. Por el contrario, es claro que los propósitos perseguidos por el mencionado artículo se verían claramente frustrados si interpretáramos que para recibir sus privilegios el obrero o materialista está obligado siempre a reclamar judicialmente su acreencia del dueño de la obra.([2]) Nótese que exigir siempre la presentación de una

---

([2]) La Asamblea Legislativa ha querido proteger los derechos del obrero en forma abarcadora, lo que resalta el carácter de alta prioridad y de justicia social de la normativa en cuestión. La Rama Legislativa no sólo promulgó el Art. 1489 del Código

demanda judicial, sería imponerle una carga adicional a aquellos obreros y materialistas que, en general, ocupan una posición desventajosa en toda esta relación contractual. Asimismo, promovería que, con posterioridad a la reclamación extrajudicial, pero antes de la presentación de la demanda, el dueño de la obra, en posible confabulación con el contratista, pague a este último la cantidad adeudada, en claro perjuicio de la garantía que este artículo intentó ofrecer a la clase trabajadora y suplidora.

Nuestra labor en estos momentos es buscar la interpretación más justiciera de la ley; la que mejor propicie su sentido y sus propósitos. *Román Mayol v. Tribunal Superior*, 101 D.P.R. 807, 811 (1973); *Pueblo v. Tribunal Superior*, 104 D.P.R. 363, 366 (1975); *Col. Int'l Sek P.R., Inc. v. Escribá*, supra; *Silva Iglecia v. F.E.I.*, 137 D.P.R. 821 (1995).

■ Por todo ello, concluimos que el dueño de una obra se convierte en deudor de obreros o materialistas, dejando de serlo del contratista, desde el instante mismo en que los obreros o materialistas reclamen su acreencia del dueño de la obra, sea esa reclamación judicial o extrajudicial.

Esta conclusión encuentra apoyo en los comentarios

---

Civil, 31 L.P.R.A. sec. 4130, aquí en controversia sino que, además, aprobó la Ley Núm. 73 de 4 de mayo de 1931 (29 L.P.R.A. secs. 186 *et seq.*) mediante la cual concedió a todo obrero o empleado que trabajase en una obra la oportunidad de gravar con preferencia dicha propiedad hasta el monto total de sus salarios.

El gravamen otorgado en estos casos, contrario a la acción provista en el citado Art. 1489, está sujeto a que el obrero, entre otras cosas, haga un requerimiento de pago al dueño o cesionario de dicha propiedad, o a su agente o representante, por conducto del Departamento del Trabajo y Recursos Humanos y a que, con posterioridad a dicho requerimiento, presente una querella judicial en la que exponga bajo juramento los hechos de su reclamación y describa la propiedad afecta al gravamen. 29 L.P.R.A. secs. 187 y 188. Esta ley requiere, a su vez, que dicha reclamación se realice dentro de un término no mayor de un (1) año después de concluido el trabajo de cuyo pago se reclama. 29 L.P.R.A. sec. 190.

Evidentemente, el legislador sujetó la protección de la Ley Núm. 73, *supra*, a la realización de ciertos eventos procesales por el obrero. No obstante lo anterior, la Asamblea Legislativa no requirió iguales formalismos para otorgar los beneficios del Art. 1489, *supra*, disponiendo tan sólo que, con una mera reclamación, el obrero o materialista se convertía en acreedor directo del dueño hasta el monto de lo que éste adeudase en ese momento.

realizados al respecto por Scaevola. Éste expresamente reconoce la reclamación extrajudicial al señalar lo siguiente:

> ... porque el derecho que el artículo 1.597 concede a materialistas y obreros, emergente de una circunstancia eventual que puede o no producirse, no es condición del contrato de obra y no debe coartar el libre desenvolvimiento y novación del mismo, cuando no medie todavía interposición de tal derecho por la reclamación *judicial o extrajudicial* de quienes pueden ejercitarlo. (Énfasis suplido.) Scaevola, *op. cit.*, pág. 164.

■ En aquellos casos, como el de autos, en los que, al momento de realizarse la reclamación, se surgiere una disputa entre el obrero o materialista y el contratista respecto de la cantidad que este último adeudase a aquél, el dueño podrá presentar una acción de consignación, a tenor con el Art. 1130 del Código Civil, 31 L.P.R.A. sec. 3180, y la Regla 19 de Procedimiento Civil, 32 L.P.R.A. Ap. III, con notificación al contratista y al obrero o materialista. A modo de ejemplo, el dueño de una obra podrá consignar en el tribunal la cantidad extrajudicialmente reclamada, en aquellas instancias en que, mediante comunicación con el contratista, advenga en conocimiento de que este último entiende que la cuantía adeudada al obrero o materialista es menor que la cantidad reclamada por ellos. La consignación, así realizada, tendrá el efecto de evitar que el dueño de la obra, por desconocer la cantidad que adeuda el contratista al obrero o materialista, se vea obligado a pagar dos veces, esto es, al contratista y al obrero o materialista.

## IV

En el caso de epígrafe, el 29 de julio de 1992 Goss reclamó extrajudicialmente a Dycrex la cantidad que P.R. Dredging le adeudara. A pesar de haber recibido dicha notificación, Dycrex, en perjuicio de la reclamación ya inter-

puesta por Goss, realizó dos pagos en favor de P.R. Dredging por la cantidad total de $64,970.

De la normativa antes reseñada, no cabe duda que los pagos realizados por Dycrex en favor de P.R. Dredging, con posterioridad a la reclamación extrajudicial, constituyeron un pago indebido, pues desde ese momento Dycrex había dejado de ser deudor de P.R. Dredging para serlo de Goss en cuanto a la cantidad que a éste se le adeudaba. No obstante lo anterior, el tribunal a quo determinó erróneamente que Goss no estaba cobijado por las disposiciones del Art. 1489 del Código Civil, *supra*, pues al momento de la presentación de la demanda, la liquidación del contrato de dragado reflejaba un balance en favor de Dycrex. Considerando que, conforme con lo antes expuesto, los beneficios del Art. 1489 del Código Civil, *supra*, comenzaron a transcurrir desde la fecha de la reclamación extrajudicial y no desde la presentación de la demanda, procede entonces devolver el caso de autos al Tribunal de Primera Instancia, Sala de Carolina, para que conforme con lo aquí resuelto, celebre una vista evidenciaria a los fines de determinar si, al momento cuando Goss realizó su reclamación extrajudicial, Dycrex adeudaba a P.R. Dredging alguna cantidad en concepto del contrato de dragado.

*Se revocará la sentencia dictada por el Tribunal de Primera Instancia, Sala de Carolina, el 28 de diciembre de 1994, y se devolverá el caso para procedimientos ulteriores compatibles con esta opinión.*